**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 17 CR 40-3 |
| | ) | |
| MARDI LANE, | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

A jury found defendant Mardi Lane guilty of conspiring to engage in a pattern of racketeering activity with other members of the LAFA street gang. The jury also made additional findings that Lane participated in a murder and the attempted murders of three other individuals. Lane has moved for a judgment of acquittal as to those additional findings pursuant to Federal Rule of Criminal Procedure 29 and for a new trial pursuant to Federal Rule of Criminal Procedure 33. Both motions are denied for the reasons set forth below.

## I.  BACKGROUND

### A.  EVIDENTIARY RECORD

In summary, the government alleged that for at least a decade, between 2008 and 2018, the LAFA faction of the Gangster Disciples (the "LAFAs") was a criminal enterprise operating in the Jeffrey Manor neighborhood on the southeast side of Chicago. According to the government, the LAFAs banded together with the common purposes of acquiring and maintaining power, accumulating wealth, and enhancing their reputation and status. They carried out those purposes through a pattern of racketeering acts committed by the defendants and their associates, including murders, shootings, home invasions, robberies, and drug trafficking (principally heroin and

marijuana). The LAFAs further endeavored to avoid detection and prosecution by instilling fear in rivals, victims, and witnesses through threats, intimidation, and witness tampering.

For much of its existence, the LAFA enterprise engaged in violent conflicts with nearby rival gangs, principally the Merrill Park Gangster Disciples ("Merrill Park GDs"), which operated around Merrill Park inside the Jeffrey Manor neighborhood, and the 10-7 gang, which operated out of the Trumbull Park public housing complex south of the neighborhood. These rivalries fueled numerous murders, attempted murders, and shootings, many involving innocent bystanders. The LAFA gang's objective was simple: "Kill all the opps and get rich." Tr. 5 at 1070.[1]

Although the LAFA enterprise lacked a formal structure or strict hierarchy, LAFA members often assumed certain roles within the gang. Some dealt drugs, others committed thefts or robberies, and others were "shooters" who committed acts of gun violence. Importantly, members who "put in work," *i.e.*, demonstrated a willingness to engage in criminal activity on behalf of the gang, gained the respect of other LAFA members and increased their standing within the enterprise. By contrast, members who failed to commit criminal acts risked subjecting themselves to criticism, pressure, and retaliation from other LAFA members.

By the account of several witnesses at trial, defendant Lane served as one of "shooters" for the LAFA enterprise. Tr. 1 at 162; Tr. 3 at 583. In that role, he gained respect from fellow gang members by demonstrating a willingness to murder perceived LAFA rivals. During the course of the racketeering conspiracy, defendant Lane either committed or participated in the murder of Deonte Hoard and the contemporaneous attempted murder of Chester Palmer (Victim 6) on March 2, 2015; the attempted murders of Darrel Thomas (Victim 7) and Jerome Curtis (Victim 8) on

---

[1] "Tr." followed by a number refers to the volume number of the trial transcript. The transcripts are docketed at ECF numbers 669 through 677.

March 27, 2015; and the attempted murders of Revon Fox, Shannon Rowe, and Darius Buckley (Victims 9, 10, and 11, respectively) on April 11, 2015.[2]

Defendant Lane was arrested by local authorities on April 12, 2015 following a high-speed car and foot chase, during which he tried to discard a firearm used in a prior shooting. In recorded telephone calls from jail, he tried to obstruct law enforcement's recovery of the gun and intimidate his shooting victims by telling them to "stop snitching" and "telling on us."

### B.    PROCEDURAL HISTORY

This case essentially began with the return of a superseding indictment charging ten LAFA members,[3] including defendant Lane, with conspiracy to engage in a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d) (Count One). R. 89.[4] The RICO conspiracy charge also included a notice of special findings regarding a number of murders and attempted murders by LAFA members. Lane was specifically charged with involvement in the murder of Deonte Hoard and attempted murders of Palmer, Thomas, and Curtis. and Fox, Rowe, and Buckley.

A jury trial was held in April 2023. R. 614-36. Over the course of two weeks, the government presented over 30 witnesses and introduced more than 500 exhibits that detailed the LAFA enterprise and its pattern of racketeering activity. In all, the government introduced evidence of drug trafficking, witness intimidation, an armed home invasion, two murders, and 10 attempted murders, including those involving defendant Lane that are described above. At the

---

[2] The April 11 shootings were not charged as special findings as to Lane's conduct and are not the subject of Lane's Rule 29 motion.

[3] This case was originally filed as a single count felon-in-possession case against Martez Easter, a cooperating defendant, in 2017.

[4] The superseding indictment also included a variety of firearms and drug charges against several defendants other than Lane.

close of the government's case-in-chief, Lane moved for a judgment of acquittal—not as to the RICO conspiracy charge per se, but as to the special findings alleging Lane's involvement in the March 27, 2015 attempted murders of Thomas and Curtis. Trial Tr. vol. 7B, 1582-83 ("We would like you to direct out of this case special finding concerning March 27, 2015, alleged shooting."). This Court reserved ruling. *Id*. at 1586; *see* Fed. R. Crim. P. 29(b). Lane renewed the same motion after all of the evidence had been admitted and before the case went to the jury; the Court again took the motion under advisement.[5] Tr. 8 at 1701.

On April 28, 2023, the jury found defendant Lane guilty on Count One, the RICO conspiracy charge. ECF Nos. 633-34. The jury further found that certain additional allegations related to the murder of Deonte Hoard and the attempted murders of Palmer, Thomas, and Curtis had been proven. Specifically, with respect to the Hoard/Palmer shooting, the jury found that the evidence proved beyond reasonable doubt that Lane committed or caused Hoard's murder (Additional Finding #1) and that the murder was committed in a cold, calculated, and premeditated manner (Additional Finding #2). By contrast, the jury found not proven beyond reasonable doubt that Lane had fired the gun in the Hoard/Palmer shootings (Additional Findings #3 and #4). With respect to the attempted murder of Palmer (who was walking with Hoard when both were shot); the jury similarly found that the evidence proved that Lane committed or caused the attempted murder of Palmer (Additional Finding #5); the jury also found that the evidence proved that either Lane or a coconspirator for whose conduct Lane was legally responsible fired the gun (Additional Finding #6).

---

[5] There is no requirement to renew a Rule 29 motion after all of the evidence has been presented to avoid waiver; indeed, there is no requirement to make a Rule 29 motion at any point before the jury returns its verdict. See Fed. R. Crim. P. 29(c)(3).

With respect to the shootings of Thomas and Curtis, the jury found that the evidence established beyond reasonable doubt that Lane committed or caused those attempted murders (Additional Findings #7 and #9) and that either Lane or a coconspirator for whose conduct Lane was legally responsible fired the gun (Additional Finding #8).

After extensions of time granted by the Court, defendant Lane filed written motions for acquittal (ECF No. 748) and for a new trial (ECF No. 747).

## II.    ANALYSIS

### A.    MOTION FOR JUDGMENT OF ACQUITTAL

After a jury's guilty verdict, a criminal defendant seeking a judgment of acquittal under Rule 29 faces a hurdle that the Seventh Circuit has deemed "nearly insurmountable." *See United States v. Jones*, 713 F.3d 336, 339 (7th Cir. 2013). Nevertheless, it is not "wholly insurmountable," and because the government bears the burden of proof, "the height of the hurdle depends directly on the strength of the government's evidence." *Id*. If the evidence is insufficient to sustain the conviction, this Court must grant a motion for judgment of acquittal. *See id*. at 339-40. The standard for a motion for judgment of acquittal under Rule 29(c) requires the court to consider the evidence in the light most favorable to the government and overturn the verdict only when "the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Peterson*, 823 F.3d 1113, 1120 (7thCir. 2016); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "Rule 29(c) does not authorize the judge to play thirteenth juror." *United States v. Genova*, 333 F.3d 750, 757 (7th Cir. 2003).

In cursory fashion, Lane first asserts that the government failed to prove the elements of Count One beyond a reasonable doubt. ECF No. 748 at 3. He discusses neither the evidence nor the law, however, and appears to make the general argument solely for the purpose of avoiding

waiver on appeal.[6] Whether successful on that score or not, Lane's undeveloped general challenge to the sufficiency of the evidence in his post-trial Rule 29 motion is inadequate to the task; "arguments that are underdeveloped, cursory, and lack supporting authority are waived." *Shipley v. Chicago Bd. Of Election Commissioners*, 947 F.3d 1056, 1063 (7th Cir. 2020).

Rather than challenging the sufficiency of the general verdict on the RICO conspiracy charge, Lane focuses his Rule 29 motion on the jury's additional findings. Specifically, he argues that the government failed to prove beyond a reasonable doubt: (1) that defendant was "involved or with Jones when [Jones] committed the Hoard murder"; (2) that the Hoard murder was committed in "cold, calculated, and premediated manner"; and (3) that the attempted murders of Victims 7 and 8 were committed in furtherance of the LAFA enterprise. ECF No. 748 at 3-18. As set forth below, each argument lacks merit, and defendant's motions are accordingly be denied.

### 1. The Hoard/Palmer Shootings

The evidence at trial, viewed in the light most favorable to the government, established that on March 2, 2015, defendant Lane went "opps shopping"—that is, searching for rival gang members to shoot. He was accompanied by fellow LAFA member, Reginald Jones. At about 7:18 p.m., after cruising through the portion of the Jeffrey Manor neighborhood that was considered to be the territory of the rival 10-7 gang, Lane and Jones encountered 17-year-old Deonte Hoard and his friend Chester Palmer, walking south on Yates Avenue, on their way to the gym to play basketball. Neither Hoard nor Palmer were members of the 10-7 gang, but no matter. Jones and Lane were in a black SUV; as the vehicle headed north and approached Hoard and Palmer walking

---

[6] "A motion under Rule 29 that makes specific arguments waives issues not presented, but a general motion preserves every objection." *United States v. Maez*, 960 F.3d 949, 959 (7th Cir. 2020).

south, it slowed. The rear driver's side window came down and the occupant of the vehicle in the back seat extended a handgun out of the open window and fired three shots at Hoard and Palmer. One of the shots hit Hoard in the left side and exited his chest; one of the shots grazed the top of Palmer's head. Both victims began to run and surveillance cameras located throughout the housing units in the area tracked Hoard's path as he ran and then collapsed in the snow in a courtyard between the apartment buildings.

Later that evening, Jones and Lane attended a party near 78th and Ingleside, where Lane told people that he had "stretched somebody out" and traded guns with one of the attendees so he wouldn't be found in possession of the murder weapon. On another occasion shortly after the shooting, Lane told fellow LAFA member Tony Parker that he had killed Hoard; when Parker asked why, Lane told him that Hoard had been in "the wrong place at the wrong time." Tr. 5 at 1091-92.

### a) Additional Finding #1: Lane's Involvement in the Hoard/Palmer Shooting

The government's evidence tying Lane to the Hoard/Palmer shooting relied principally on the testimony of fellow LAFA members Reginald Jones and Tony Parker, both of whom cooperated with the government and received attractive plea deals.[7] Lane argues that Jones' testimony was not credible due to the plea deal and points to a number of inconsistent and

---

[7] The government entered into a plea agreement with Jones that included an agreed sentence of between 10 and 15 years of imprisonment, to be determined by the court if it accepted the deal. Parker's plea deal was not conditioned on the court's acceptance of an agreed sentence and the government agreed only that it would recommend that Parker's sentence be served concurrently with a state court sentence he was serving and that it would not argue for a sentence in excess of 66% of the low end of the applicable guideline range. Ultimately, the court sentenced Jones to 15 years and Parker to 94 months, crediting the time Parker had served in state custody for conduct that was also part of the racketeering activity charged in the superseding indictment.

inaccurate statements that Jones made during the investigation and while testifying at trial. That argument falls flat. The "deferential standard of review" under Rule 29 "is difficult for any defendant to overcome," but when a defendant's sufficiency challenge "primarily attacks a credibility determination, his task is even more difficult." *United States v. Alcantar*, 83 F.3d 185, 189 (7th Cir. 1996). That is because questions of credibility are solely for the trier of fact." *United States v. Curry*, 79 F.3d 1489, 1497 (7th Cir. 1996). "[S]ufficiency arguments based upon witness credibility are all but frivolous." *United States v. Chester*, 2017 WL 3394746, *14 (N.D. Ill. 2017).

Lane had the opportunity at trial to fully cross-examine Jones and Parker, and to argue their lack of credibility, and did so. Plainly, the jury accepted at least some of their testimony and it is not the province of the court to second guess their credibility assessments. "Only in the narrowest of circumstances," the Seventh Circuit has said, "will the defendant succeed … in establishing that testimony credited by a jury was incredible as a matter of law":

> The defendant must show that the challenged testimony was unbelievable on its face, and that may be done in one of two ways— by showing that it would have been physically impossible for the witness to observe what he described, or impossible under the laws of nature for those events to have occurred at all.

*Alcantar*, 83 F.3d at 189. Lane makes no such showing but rather asserts that discrepancies, inconsistencies, and motives to fabricate required the jury to reject the testimony of Jones and Parker. As the government observes, however, "that is not enough." "Discrepancies arising from impeachment, inconsistent prior statements, or the existence of a motive do not render witness testimony legally incredible." *United States v. McEntire*, 153 F.3d 424, 435 (7th Cir. 1998).[8]

---

[8] Lane argues that because Parker testified that he encountered Lane and Jones at a LAFA gathering spot that evening, while Jones testified that the duo stopped in at a party located elsewhere on the south side, neither witness should be credited. The testimony is not necessarily inconsistent, however; Parker was not present at the party at Ingleside and 78th and Jones did not affirmatively deny that he and Lane also stopped in at the LAFA gathering. Moreover, the date of

The jury, moreover, did not consider the testimony of Jones and Parker in a vacuum. At trial, the government offered ample evidence that provided corroboration for their testimony. For starters, their testimony about who killed Hoard was consistent: Jones testified that Lane fired the shots from the Jeep SUV they were riding in and Parker testified that Lane told him that he (Lane) had shot Hoard. They came to this information independently; there is no evidence that Jones and Parker colluded to falsely implicate Lane in Hoard's murder. Their testimony that Lane was the shooter is also supported by the testimony of Martez Easter, who testified that Lane's role with the LAFA gang was a "shooter." *See, e.g.*, Tr. 1 at 161-62. That status was further confirmed by Lane's tattoos (including "FTO"—fuck the opps—and "MPK"—Merrill Park Killer). The jury also saw video footage (taken by Jones on his cell phone) of Lane firing a handgun into an open field behind a residence in which they were staying in Duluth, Minnesota, while extolling the virtues of LAFA members who were Gangster Disciple—*i.e.*, Merril Park--killers.

More specifically with respect to the Hoard/Palmer shooting, Jones' testimony that he drove Lane from Minnesota to Chicago on the morning of the Hoard/Palmer shooting was supported by cell site location data and related information showing that phones associated with Jones and Lane traveled from Duluth to Chicago between 5:00 a.m. and 11:00 a.m. Jones testified that they drove in a black Jeep SUV and a variety of evidence linked Jones to a black Jeep Grand Cherokee SRT around that date. Jones testified that later that day, after declaring that he wanted

---

the LAFA gathering was not definitively established—indeed, the defense worked mightily to impeach Parker with prior statements that it might have taken place the day after the shooting. Finally, while Lane attempts to conflate the LAFA gathering that Parker described ("it wasn't no party") with the party at Ingleside and 78th, the jury reasonably could have concluded that they were two separate events. In any event, and as noted below, it seems clear that the jury credited Jones' testimony (and the other corroborating evidence) that he and Lane were opps shopping together while also concluding that the evidence did not prove beyond a reasonable doubt that Lane was the shooter.

to go "opps shopping," Lane told Jones to drive to "the back" of Jeffrey Manor, an area including the Trumbull Park homes which several other witnesses identified as territory controlled by the rival 10-7 gang.[9] Cell site location data also corroborated Jones' testimony about what happened after the Hoard/Palmer shooting. Consistent with Jones' testimony, Jones' phone pinged a cell tower only a few blocks away from the site of the shooting at 7:15 p.m. Tr. 4 at 821-23 and 854-55. The phones associated with Jones and Lane both pinged cell towers near the location of the party at 78th and Ingleside after the shooting, at 8;07 p.m. and 8:17 p.m., respectively, and moved in tandem for the balance of the evening, both often pinging off the same cell towers and revealing a pattern "consistent with the phones having traveled back down to the same general area at the same general time." Tr. 4 at 825. And, also consistent with Jones' testimony, the cell site location data showed both Jones' and Lane's phones together throughout the next day, and then traveling back together to Duluth on March 4. Tr. 4 at 826. In short, there was independent evidence that Jones and Lane arrived together on the day Hoard was murdered, spent most of the next two days together, and then returned to Minnesota together.

Other evidence also corroborated details of Jones' account of the Hoard/Palmer shooting. Jones also testified that shortly after they began "opps shopping" they encountered Sean Humes, an acquaintance of Jones, who was walking from the Trumbull Park homes.[10] This was just a few minutes before the shooting and Chester Palmer testified that, a few minutes before the shooting, he, too, saw Humes walking from the Trumbull Park homes. Jones also testified that after talking

---

[9] Parker testified that Lane wanted to avenge the death of fellow LAFA Antonio Calhoun, who had been murdered by members of the 10-7 gang in September 2013. Tr. 5 at 1080-84.

[10] Jones testified that when they encountered Hume, Lane began lowering his window in order to shoot him. Jones intervened, however, and told Lane that Hume was not an "opp." After speaking with Hume, Jones and Lane then continued their hunt.

to Humes, he traveled several blocks and paused at a traffic circle in the middle of the Trumbull Park housing complex; Palmer confirmed that he first saw the car from which the shots were fired parked at the traffic circle as he and Hoard were walking south on Yates Avenue. Palmer also testified—consistent with Jones' testimony—that the shots were fired from the back seat of the car. That fact was also confirmed by video camera footage. Forensic analysis indicated that the three shell casings that were found at the scene were all fired from a single gun, again a fact consistent with Jones' testimony. Finally, the trial evidence also included testimony from a deputy marshal about an incident in the lock-up during the trial when, seeing Parker brought into the lockup, Lane berated Parker for snitching on Lane and telling others detained in the lockup that Parker was a "rat." Notably, the only incriminating information Parker provided as to defendant Lane's criminal conduct was Lane's confession that he shot Hoard because Hoard had been in the wrong place at the wrong time.

Admittedly, none of the evidence corroborating Jones' and Parker's testimony would, standing alone, prove that Lane was the shooter in the Hoard murder. But the additional evidence supports, rather than undermines, Jones' account of the Hoard murder. And further, the jury was not required to find that Lane was the shooter in order to return Additional Finding #1 as "proven." That finding required only that Lane committed or caused Hoard's murder, which he could do whether or not he pulled the trigger on the gun used to shoot Hoard and Palmer. The jury clearly understood as much, because they also found in Additional Findings #3 and #4 that it was "not proven" that Lane was the shooter; contrary to Lane's argument, the jury evidently and reasonably concluded that while the evidence did not establish beyond a reasonable doubt that Lane was the shooter, it nevertheless established beyond reasonable doubt that Lane was in the car with Jones looking for members of the 10-7 gang to kill. Even if Jones was actually the shooter, there was

ample evidence to show that Lane was a culpable participant in the "opps shopping" that he and Jones conducted.

### b) Additional Finding #2: Cold, Calculated, and Premeditated Manner

Lane also argues that the evidence of Hoard's murder "f[e]ll short of proof beyond a reasonable doubt that the murder was committed in a cold, calculated, and premediated [sic] manner. He acknowledges that "the events described by Jones . . . may appear cold, calculated, and premeditated," but maintains that "opps shopping" was "nothing more than a pastime."

This argument borders on frivolous, which explains the lack of citation to any authority whatsoever to support the single paragraph the defendant's motion devotes to it. Under Illinois law, "cold" means "not motivated by mercy or the emotion of the moment." *People v. Williams*, 737 N.E.2d 230, 250 (Ill. 2000), while "calculated and premeditated, pursuant to a preconceived plan, scheme, or design" means "deliberated and reflected upon for an extended period of time." *Id*. at 230. As the government explains, "[a]lthough time is an essential element, . . . the law does not impose a minimum period of reflection; instead, time offers a lens through which to evaluate the presence of 'forethought, careful reflection, or a deliberately arranged purpose.'" ECF No. 754 at 20 (quoting *People v. Mata*, 853 N.E.2d 110, 118 (Ill. App. 3d 2006).

Plainly, Hoard's murder was "cold, calculated, and premeditated." Hunting for rival gang members to shoot for sport—as a "pastime"—could hardly be less the product of the emotion of the moment, and Hoard's murder after Jones' and Lane's hunt for opps was the culmination of their preconceived plan, which required them to drive to the territory claimed by the 10-7 gang (the Trumbull Park housing complex) and conduct a systematic search for targets—"opps"—to kill. Jones and Lane did not indiscriminately shoot anyone they encountered, as their interaction with Hume confirms; they had specific selection criteria in mind. That suffices to show that Hoard

was not murdered on the spur of the moment; to the contrary, Tony Parker testified that Lane had long been seeking to avenge the 10-7 gang's murder of Antonio Calhoun in September 2013—about a year and a half earlier. See *United States v. Brown*, 973 F.3d 667, 687–88 (7th Cir. 2020) (citing fact that motive for murder arose eighteen months before the murder and prompt action on notice of opportunity to carry out the murder as factors showing that murder satisfied requirement of a "substantial period of reflection or deliberation").

*People v. Brown*, discussed in detail by the government, is particularly germane. In *Brown*, the Illinois Supreme Court found that a murder was "cold, calculated, and premeditated" where—as here—two gang members formed a plan to go to a particular location for the purpose of killing members of a rival gang. They obtained a vehicle, armed themselves, traveled to the location of the targets, and ambushed the targets without warning as they sat on a front porch. Apart from the fact that Jones and Lane already had a vehicle and gun, the scenarios are the same. The jury could easily and reasonably conclude that Hoard's murder was "cold, calculated, and premeditated."

### 2. Additional Findings # 7-9: Attempted Murders of Thomas and Curtis

Defendant Lane also moves for a judgment of acquittal as to Additional Findings #7, #8, and #9, which relate to the attempted murders of Darrel Thomas and Jerome Curtis. Viewed in the light most favorable to the government, the evidence at trial reasonably permitted the jury to find that on March 27, 2015, LAFA member Martez Easter met up with defendant Lane and fellow LAFA members Quentin Lucious and Carey Hinton in Jeffrey Manor to sell them marijuana. Lane, Lucious, and Hinton were in a rented silver Volkswagen Beetle and Lucious was armed with a Glock pistol loaded with a 50-round magazine. After completing the drug deal, all four LAFA members (Easter in his own car, the others in the Volkswagen) visited a strip club in the south suburbs. Afterward, the four LAFA members traveled north together and, around midnight, were

13

heading west, on 47th street. Easter was following the Beetle. Easter heard gunshots while the group was stopped at a red light and then saw the Beetle speed off. Easter followed and called Lucious to find out what had happened. Lucious explained that he had fired at the occupants of another car who were "goofy cappin" and "mean mugging"—that is, staring down the LAFA's in the Beetle. Lucious told Easter that he "had to get their mind right." Darrel Thomas, who was driving the car that Lucious fired at, was hit in the leg.

The evidence also established that Lane had arranged for a proxy to rent the Beetle a day or so before this shooting. Some two weeks after this shooting, on April 12, 2015, police tried to apprehend Lane and Lucious for another shooting that had occurred on April 11, 2015, and a high-speed chase ensued; the Beetle crashed in Dolton, Illinois. Lane was arrested after a short foot chase after tossing a handgun into the backyard of a home where the Beetle crashed.

In challenging the additional findings relating to the attempted murders on March 27, 2015, Lane argues only that the shootings were unrelated to the LAFA enterprise and its pattern of racketeering activity. Lane notes that the shooting did not take place in territory claimed by the LAFAs or their rivals, neither Thomas nor Curtis were gang members, and there is no evidence that the shooting benefitted the LAFAs in any way. As such, Lane argues that the incident had nothing to do with the pattern of racketeering activity alleged in the indictment, requiring judgment in Lane's favor as to Additional Findings #7-9.

In response, the government correctly notes that the additional findings do not require a determination that the activity in question benefitted the gang in any way. Rather, to find Additional Findings #7-#9 "proven," the jury need only have found that the activity in question was part of the pattern of racketeering activity alleged in the indictment. And here, the evidence sufficed to show that retaliation for disrespect was an integral means by which the LAFAs operated

the gang. As Martez Easter testified, if someone disrespected a LAFA member, violent retaliation was expected. Tr. 1 at 245. Relatedly, one's standing within the gang was a function of the respect one received from other members based on the work they performed for the enterprise and how they responded to disrespect. Easter testified that failure to respond to disrespect damaged one's standing in the gang, prompting others to regard someone who tolerated disrespect as a "bitch":

> Q: What about disrespect, how was that considered or treated within the LAFAs?
>
> A: It's probably handled like—you're probably going to get, like, a violent response. That's, like, the normal thing.
>
> Q: Why?
>
> A: Because if somebody disrespect you, you got to disrespect them back.
>
> Q: Would anything happen if a LAFA did not respond to disrespect?
>
> A: Yeah. People probably would just, like, push you off to the side, just like I said, target you, like just think you just weak.
>
> Q: And by other people, who are you referring to?
>
> A: People inside the gang, like not nobody on the outside.
>
> Q: If you saw a LAFA member be disrespected and not do anything about it, what would you think of that LAFA member?
>
> A: I probably think he a bitch or something like that.

Tr. 1 at 152-53.

As this exchange reflects, maintaining respect was important to the members of the LAFA gang and gang members regularly employed violence to maintain the respect of their fellow LAFAs. And so, the jury could reasonably conclude that in retaliating for disrespect he perceived he was receiving from Thomas and Curtis, Lucious was engaging in violence that was integral to

15

the operation of the gang and his own standing within the enterprise.[11] Had Lucious been alone when this alleged slight occurred, there would be no connection to the pattern of racketeering through which the LAFA gang was operated. But Lucious was not alone. He was among his fellow LAFAs when he perceived Thomas and Curtis to be "goofy cappin" and "mean mugging" him. Had he not retaliated for that disrespect, as the government observes, "he risked his standing—and security—within the gang." Accordingly, Lane's challenge to Additional Findings #7-#9 fails.

### B.  MOTION FOR A NEW TRIAL

In the alternative to vacating the jury's additional findings, Lane seeks a new trial pursuant to Federal Rule of Criminal Procedure 33. That rule provides that a trial court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A defendant is entitled to a new trial only if there is a reasonable possibility that a trial error had prejudicial effect upon the jury's verdict. *United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir. 2006). A jury verdict in a criminal case is "not to be overturned lightly," and therefore a new trial should be granted only where there is serious danger that a miscarriage of justice occurred. *See United States v. Morales*, 902 F.2d 604, 606 (7th Cir. 1990). "The exercise of power conferred by Rule 33 is reserved for only the most extreme cases." *United States v. Peterson*, 823 F.3d 1113, 1122 (7th Cir. 2016).

To begin, and as the government's response correctly observes, the defendant's motion for a new trial is largely a laundry list of rulings by the Court as to which the defendant's objections were overruled. As to most, the arguments are perfunctory and underdeveloped and could be

---

[11] As the government also points out, this evidence is also relevant because it supports that it was reasonably foreseeable to LAFA members that their fellow conspirators would respond violently to perceived disrespect by others.

denied on that basis alone. *Shipley v. Chicago Bd. of Election Commissioners*, 947 F.3d 1056, 1063 (7th Cir. 2020) (arguments that are undeveloped, cursory, and lacking supporting authority are waived); *United States v. Morales*, 572 F. Supp. 3d 502, 508 (N.D. Ill. 2021) (St. Eve., J.) (finding that defendant waived his claims under Rule 33 by "raising twenty-one underdeveloped, perfunctory arguments," many of which were "presented in a single sentence"). Nevertheless, where it is possible to identify the substance of the defendant's claim of error, the Court will address the substance of the defendant's argument.

### 1.    The Court did not err in admitting co-conspirator statements.

Defendant Lane maintains that the Court erred in denying the arguments set forth in his Response to the Government's Santiago Proffer. (Doc. 535), but with two exceptions, he does not identify those arguments or offer any support for that conclusory statement:

> ### a)    The admission of Tony Parker's testimony about Lane's statements to Tony Parker at the LAFA gathering after the Hoard/Palmer shooting was not error.

Lane's statements are not hearsay, as Lane maintains; they are admissions by Lane, a party opponent, and are therefore non-hearsay admissible under Rule 801(d)(2)(A). The statements need not have been in furtherance of the conspiracy.

> ### b)    The admission of Lucious' statement to Lane about why he shot at Thomas and Curtis was not error.

Lane argues that Quentin Lucious' explanation that he shot at Thomas and Curtis because they were "goofy cappin" him rests on the argument that the shooting was not in furtherance of the conspiracy; that argument was rejected above in connection with Lane's Rule 29 motion and fails for the same reason here.

### 2. The Court did not err in admitting evidence of the March 27, 2015 attempted murders of Thomas and Curtis.

Lane's argument that the Court erred in overruling his pretrial objection to evidence relating to the attempted murders of Thomas and Curtis fails for the same reason.

### 3. The Court did not err in admitting limited evidence of Lane's participation in rap videos.

The Court admitted redacted versions of two rap videos, one because it included Mr. Lane (Govt. Ex. 302) and the other (Govt. Ex. 301) because it included Reginald Jones and showed areas relevant to the Hoard/Palmer shooting, such as the corner store at 106th and Bensley, where Jones testified that he and Lane encountered Sean Humes. Tr. 3 at 663-71. The Court excluded as cumulative two other videos the government sought to introduce. In admitting this evidence, the Court explained that the videos were highly relevant evidence of the existence of the enterprise and its objectives, and that it was not unfairly prejudicial to permit the government to put before the jury non-cumulative evidence of how the LAFA enterprise operated and promoted itself and its objectives. The videos are direct evidence of the existence of the RICO enterprise and conspiracy, so the defendant's contention that they were inadmissible "other acts" evidence under Rule 404(b) falls flat. And finally, the argument that admitting these videos violates the defendant's First Amendment rights is frivolous.

### 4. The Court did not err in admitting evidence of tattoos.

The court denied the defendant's motion to exclude evidence of his tattoos, specifically three tattoos: "MPK" which the evidence established stood for Merril Park Killer; "FTO," which the evidence established meant "Fuck the Opposition,"; and "LAFA," which was of course a reference to the gang. These were not all of Lane's tattoos; the government sought to introduce only these three—all of which are the equivalent of statements by the defendant. As such, the

LAFA tattoo constitutes direct evidence of Lane's membership in the gang; MPK and FTO evidence not only Lane's membership in the gang but of the gang's objectives. Further, the admission of these three tattoos did not unfairly prejudice Lane; he decided to broadcast these messages to the world about the organization he belonged to and the nature of its activities. That evidence hoists a defendant on his own petard does not make that evidence unfairly prejudicial. The government cited out-of-circuit authority for the proposition, but the Seventh Circuit has also frequently noted evidence of tattoos as relevant for numerous purposes, such as proving the association of members of an enterprise. *See, e.g.*, *United States v. Brown*, 973 F.3d 667, 684 (7th Cir. 2020) ("The Hobos also showed their unity through tattoos and hand signs.").

### 5. The Court did not err in admitting opinion testimony regarding cell tower connection data.

The defense maintains that expert testimony regarding cell tower connection data is unreliable and should not have been admitted under Fed. R. Evid. 702. The court explained its disagreement with that argument at the pretrial conference on April 7, 2023, and ruled that the government's expert, Special Agent Raschke, would be permitted to testify within the parameters established by the Seventh Circuit in *United States v. Hill*, 818 F.3d 289 (7th Cir. 2016) and *United States v. Adame*, 827 F.3d 637 (7th Cir. 2016). The government hewed to these parameters at trial and no contention has been made otherwise. There was no error in admitting this evidence.

### 6. The Court did not err in admitting opinion testimony regarding firearms toolmark analysis.

The defense maintains that the court erred in admitting expert testimony regarding firearms toolmark analysis. The court's analysis of the admissibility of this evidence tracked the analysis previously reviewed and approved by the Seventh Circuit in *Brown*, 973 F.3d at 704 (7th Cir. 2020) ("The district court used the methodology prescribed by the Rule, and we see no abuse of

discretion in its application of these principles. Almost all the defendants' contentions were issues that could be raised on cross-examination. These arguments go to the weight of the evidence, not its admissibility."). The court issued a written pretrial order denying the defendant's motion to bar such evidence but limiting its scope. ECF No. 607. Neither of the experts who testified at trial went beyond those limits and no objection to their testimony was renewed. The defendant's Rule 29 motion offers no further substantive argument to buttress his claim of error as to the admission of this evidence.

### 7.  The Court did not err in admitting evidence of Lane's state court guilty plea and conviction of aggravated discharge of a firearm.

Defendant moved in limine to bar evidence of his prior state court guilty plea to a charge of  aggravated discharge of a firearm relating to the April 10, 2015 shooting of Fox, Rowe, and Buckley. The defendant's statements under oath in a plea colloquy are plainly admissible non-hearsay. At the pretrial conference, the defense further objected to any reference to Lucious's plea (they were charged together); the government agreed to redact that portion of the plea transcript and no reference to Lucious's plea was made at trial. There is no merit, then, to this claim of error.

### 8.  The Court did not err in denying Lane's motion to redact from the indictment provided to the jury allegations that Lane attempted to murder 9, 10, and 11.

The court denied Lane's motion to redact from the indictment the allegations regarding Lane's involvement in the April 10 s hooting of Fox, Rowe, and Buckley, finding that it was adequately alleged to be sufficiently connected to the LAFA conspiracy because one of the targets was a member of the Merril Park GDs and the took place outside the duplex where he lived. The defense made no argument on this ruling when addressed at the pretrial conference and does not do so in its Rule 33 motion.

**9.      The Court did not err in denying voir dire questions submitted by Lane.**

Both parties submitted proposed voir dire questions, which the court used in formulating the written questionnaire that jurors were required to complete before voir dire began in the courtroom. The court provided its initial draft questionnaire to the parties for review, and the parties had an extended discussion at the pretrial conference on April 14, 2023, at which the defense requested that the court restructure a number of questions that asked whether the juror had experiences or views of certain types that might affect their ability to be fair and impartial. The defense argued that formatting the question in that manner would prevent the parties from learning about significant incidents if the potential juror provided a  negative response due to the inclusion of the qualification that the event "might affect your ability to be fair and impartial." The defense identified questions 24 (opinions about criminal justice system), 25 (allegations of murder and violent crime), 26 (firearm ownership), 27 (drug trafficking), and 29 (gang activity) as implicating this issue. The defense also requested a new question about juror attitudes with respect to rap videos, though they did not propose specific language.

The court noted in response that these questions had to provide some barometer as to what experiences were sufficiently material to include in response; otherwise, the jurors might not understand that they need not refer to every traffic ticket they have ever received. Nevertheless, the court revised several questions in the manner that the defendant requested, specifically 24 and 29. The court declined to revise questions 25 and 27 because few jurors would have indicated that they did not frown on crimes of the sort referred to in those questions. No change was made to question 26, because it did not ask for information about attitudes. The court also added a question regarding attitudes toward rap music and videos. The revised questionnaire was provided to counsel on April 16, 2023, and no further objections were lodged. The defendant's Rule 33 motion

fails to identify any question that was not effectively covered by the court's questionnaire, much less to explain how any such omission prejudiced the defendant. Accordingly, this claim of error is unfounded.

### 10. The Court did not err in overruling Defendant's objections to the government's motions in limine.

Defendant Lane also includes a general claim that the court erred in overruling the defendant's objections to the government's motions in limine. This generic claim identifies no specific rulings and is therefore rejected.

### 11. The Court did not err in admitting medical examiner photographs

The defendant argues that the court erred in allowing the government to admit photographs of the forensic examination of Deonte Hoard. The court reviewed all of the autopsy photos, however, and limited the government to three photographs of Hoard's torso, one that showed both an entrance and exit wound, and the other two showing closer views of the entrance wound and exit wound, respectively.[12] The photos, while grim, were sterile and did not provoke an inflamed response on viewing. To further mitigate any undue prejudice, the court did not allow the government to introduce forensic diagrams of the wounds in addition to the three photographs. The court therefore sees no abuse of discretion in admitting this limited evidence to establish the cause of Mr. Hoard's death.

---

[12] The government was also permitted to introduce photos of the clothes that Mr. Hoard was wearing when he was shot, which showed holes corresponding to the gunshot wounds that he sustained. These photographs were not inflammatory or otherwise provocative.

### 12.    The Court did not err in admitting crime scene photographs

Without identifying specific photos, the defendant asserts that the court erred in not barring "certain" crime scene photos. The court reviewed all of the crime scene photos the government sought to admit, however, and excluded many of them, noting at the April 7 pretrial conference that it would be cumulative to introduce all of the available photos. As to crime scene photos generally, the court noted during the pretrial conference on April 14 that the crime scene photos allowed by the court made it much easier to understand the testimony about what happened in a particular episode. In any event, absent the identification of specific photos, there is no basis to evaluate, much less sustain, defendant's claim of error in this regard.

Lane also objected to the admission of footage from surveillance cameras in the area of the Hoard/Palmer shooting. The court excluded one of the videos, depicting Mr. Hoard's last movements, but found that each of the other videos provided a piece of information showing how the shooting occurred and what happened in the immediate aftermath. These videos were highly relevant to the jury's understanding of the facts and circumstances relating to the shooting and were not unduly prejudicial (as reflected in the jury's conclusion that it was "not proven" that defendant Lane was the shooter).

### 13.    The Court did not err in admitting a video of Lane target practicing.

Lane claims error in the admission of a video taken in Duluth, Minnesota, by Jones on his cell phone. (Govt. Ex. 309). The video shows Lane firing a handgun into a field behind a house. In the video, Lane also "threw up the Ls and dropped the rakes," while praising GDKs (Gangster Disciple Killers) and advising "you know we out here, boy . . . blowing at the opps." This evidence was highly probative of Lane's membership and role in the LAFA enterprise, providing corroboration of the testimony from witnesses describing Lane as a shooter for the gang, and

confirming Jones' testimony that he traveled to Duluth with Lane on numerous occasions to sell drugs. The court sees no error in admitting Lane's own words and actions as evidence that he was fully committed to the goals of the LAFA enterprise.

### 14. The Court did not err in admitting recorded jail phone calls made by Lane and Lucious.

The government presented a number of recorded jail calls on the theory that they involved defendant Lane. The defense objected to the admission of the calls, arguing that the evidence did not dispositively establish that Lane was a party to the calls. The court overruled the defense objections, noting that they could cross-examine the witnesses providing that foundation and offer its own evidence to show that Lane was not on the recordings. There was no error in that ruling; whether Lane was a participant on the calls was simply a fact dispute that they jury had to resolve.

### 15. The Court did not err in admitting recorded 911 calls.

During the trial, the court admitted several recordings of 911 calls relating to the shootings on March 2, 2015, and on April 11, 2015. With regard to the Hoard/Palmer shooting, the government sought to introduce 4 recordings; the court allowed only two, excluding the others as cumulative and unduly prejudicial. Govt. Ex 936, in which Palmer's girlfriend reported that he had been shot, and Govt. Ex. 938, reporting that 3 to 4 shots had been fired into a front window, were admitted. Lane's motion does not explain why there was any error in admitting these calls and they are relevant to a complete understanding of the shooting. The calls were not unduly prejudicial as they did not present overly emotional reactions to the shootings. The court properly exercised its discretion to allow these calls while excluding the others offered by the government.

With regard to the 911 call recording on April 11, 2015, the call was made by Shannon Rowe, one of the victims of the shooting and is relevant to explain what happened on that occasion.

In addition, Rowe stated that two of the occupants of the car from which the shots were fired were Lane and Lucious, information he received from one of the other victims of the shooting, Darius Buckley. Lane does not provide a basis for his claim of error in admitting this call, but apart from its relevance, the court found that both Buckley's identifications and Rowe's statements on the 911 call qualified for the exception to the hearsay rule as excited utterances. The court sees no error in that ruling.

> ### 16. The Court did not err in sustaining the government's objection to cross-examination of Tony Parker concerning a statement Jones allegedly made as to Cornell Patrick's presence in the Jeep SUV when Hoard and Palmer were shot.

During the cross-examination of Tony Parker, the defense sought to impeach Parker's testimony by asking Parker about statements Reginald Jones made to him about the shooting—specifically, a statement by Jones to the effect that Cornell Patrick had also been in the Jeep. This statement was hearsay (offered to prove that Patrick—another possible shooter—was in the vehicle), the government objected, and the court sustained the objection. The defense argued that the statement was admissible as a co-conspirator statement, but such statements are only admissible non-hearsay when offered against an opposing party, per Rule 801(d)(2). The defense also argued that the statement was offered to impeach Jones' testimony about who was in the Jeep, but extrinsic evidence of a prior inconsistent statement is admissible under Rule 613(b) only if the witness was given an opportunity to explain or deny the statement. There was no error in sustaining the government's objection.

> ### 17. The Court did not err in allowing Easter to authenticate a rap video.

In objection 3, above, the court rejected Lane's claim that the admission of the rap video titled LAFA R******* was error due to lack of relevance, undue prejudice, and violation of Lane's

First Amendment rights. Here, the defense also claims that the video was not adequately authenticated because the government had no witness to call who was present when the video was filmed. The court disagreed. "Only a prima facie showing of genuineness is required; the task of deciding the evidence's true authenticity and probative value is left to the jury." *United States v. Fluker*, 698 F.3d 988, 999 (7th Cir. 2012). Evidence can be authenticated through testimony from a "person with knowledge" or testimony about the "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Fed. R. Evid. 901(b)(1), (4). Here, the evidence met that standard. The government presented testimony that LAFA gang members made rap music videos and posted them on the internet— where this video was found—to promote the gang and its lifestyle. Martez Easter testified that he had appeared in at least one such video, he had viewed the video in question, and was able to identify the participants as fellow LAFA members. Further, and importantly, defendant Lane admitted in an interview with law enforcement after his arrest in 2020 that he had appeared in a LAFA video made by "Maserati Rick" and "Bobo," the two principal performers in the LAFA R******* video. This was sufficient information to clear the authentication threshold to admissibility.

### 18.     The Court did not err in admitting medical records.

Lane makes a generic claim that the court erred in admitting victim medical records. He does not identify any specific records that were entered in error, however, so there is no basis to sustain his claim. To the extent that he is referring to the medical records of Darrel Thomas (Victim 8), no objection to the records admitted was made at trial. Further, the fact that Thomas was seriously injured by a gunshot wound was highly relevant and the medical records were not unduly prejudicial.

### 19.    The Court did not err in striking jurors for cause.

The defense claims that the court erred in overruling defense challenges for cause during voir dire, but identifies no specific challenges, so there is no basis on which to evaluate, much less sustain, this claim of error.

### 20.    The Court did not err in overruling foundation objections

The defense claims that the court erred in overruling objections to lack of foundation, but identifies no specific challenges, so there is no basis on which to evaluate, much less sustain, this claim of error.

### 21.    The Court did not err in denying the defendant's request to bifurcate the jury deliberations into a guilt phase and a sentencing phase

At trial, the defense sought to bifurcate the deliberations into a guilt phase and a sentencing enhancement phase, contending that without bifurcation, the defense is required to take inconsistent positions, as follows: "The defendant did not commit this crime, but if you conclude that he did, then he didn't commit the crime in these specific ways."

The court rejected the defense request because there is no inconsistency in arguing that Mr. Lane is not guilty of RICO conspiracy, didn't make a cold and premeditated plan with Reggie Jones to go opps shopping, and wasn't involved in the shooting of Deonte Hoard and Chester Palmer. To the contrary, those positions are entirely consistent; none requires a concession or assumption of guilt as to anything. Moreover, bifurcating deliberations implies bifurcating closing arguments, but evidence of guilt cannot be neatly segregated from evidence that pertains to a sentencing enhancement and will undoubtedly be addressed in both phases. (It seems quite unlikely that, in in arguing that Lane is not guilty of the racketeering conspiracy charge, defense counsel would refrain from arguing that Mr. Lane didn't pull the trigger.) Bifurcation will therefore

only invite duplication and inefficiency, while placing substantial additional demands on jurors who expect that, having reached a verdict as to the charge, their duty as jurors will end, only to find out that they must receive more instructions of law, listen to more arguments by counsel, and then return to the jury room to resume their deliberations. For these reasons, trial courts in this district frequently deny bifurcation requests in cases that require special findings as to sentencing factors. Defense attorneys maintain that they should be able to argue that the jury should find the defendant not guilty because he isn't guilty and not have to address what they should or shouldn't do if their client is found guilty. But this court is unpersuaded. But why do defendants have a right to address the evidence against them in piecemeal fashion?[13]

Addressing guilt and sentencing enhancements together is essentially no different than structuring arguments about the elements of an offense. In every trial, defense lawyers are required to argue about the government's failure to prove all of the elements of the offense. An argument about the elements of a RICO conspiracy charge, for example, might go as follows: "There is no enterprise, but even if you decide an enterprise existed, there is still no evidence that Lane agreed to conduct the affairs of that enterprise through a pattern of racketeering activity." That argument is no different in terms of inconsistency or prejudice than an argument that says: "Lane wasn't in the Jeep, but even if you decide that he was, there is still no evidence that he pulled the trigger."

Courts have wide discretion in managing trial proceedings and the court sees no prejudice to Mr. Lane in declining his request for a bifurcated deliberation process.

---

[13] To the extent that lawyers argue that they need to preserve their credibility with the jury, the point is not persuasive. Allowing an attorney to present herself or himself in a positive light is not a legitimate premise on which to structure trial procedures. The question is whether the evidence presented establishes certain facts beyond a reasonable doubt, not whether the jury trusts or believes a lawyer.

**22.    The court did not err in denying jury instructions proposed by the defense or overruling defense objections to jury instructions.**

The defense claims that the court erred in denying jury instructions submitted by the defense and in overruling objections to the government's additional findings instructions, but identifies no specific challenges and offers no explanation as to why the court's rulings were in error, so there is no basis on which to evaluate, much less sustain, this claim of error.

**23.    Upholding the jury's verdicts as to the Hoard murder would not be manifestly unjust.**

In his motion for a new trial, Lane repeats the arguments set forth in his Rule 29 motion challenging the sufficiency of the evidence supporting the jury's verdicts as to Additional Findings #1 and #2, relating to the murder of Deonte Hoard and the attempted murder of Chester Palmer. A new trial is warranted "where the evidence preponderates so heavily against the defendant that it would be a manifest injustice to let the guilty verdict stand." *United States v. Reed*, 875 F.2d 107, 114 (7th Cir. 1989). Noting that, unlike Rule 29, Rule 33 does not require a trial court to defer to a jury's credibility findings and that this court should therefore reject the testimony of Reggie Jones and Tony Parker as to Lane's participation in these shootings.

There is no need, however, "to engage in a second end-to-end review of the same evidence … used in determining sufficiency under the motion to acquit." *United States v. Conley*, 875 F.3d 391, 400 (7th Cir. 2017). It is true a district court can consider witness credibility in evaluating a motion for a new trial, *id.* at 399, but that discretion does not grant trial courts unbridled license to substitute their credibility assessments for those of the jury. "Overturning the jury's determination on the credibility of the testimony of [Jones and Parker] would require the court to make the exacting and rare determination that [their] testimony was incredible as a matter of law." *Id.* at 400 (citing *United States v. Hayes*, 236 F.3d 891, 896 (7th Cir. 2001)). "Such a determination

29

is usually reserved for extreme situations wherein, for example, "it would have been physically impossible for the witness to observe what he described, or 'it was impossible under the laws of nature for those events to have occurred at all.'" *Id. See also United States v. Kuzniar*, 881 F.2d 466, 471 (7th Cir. 1989) (in adjudicating a Rule 33 motion for a new trial, a district court may take testimony away from the jury only "where the testimony contradicts indisputable physical facts or laws"). "A finder of fact is entitled to believe the testimony of even the most dishonest of witnesses." *United States v. Algee*, 309 F.3d 1011, 1016 (7th Cir. 2002).

This was not one of those rare instances in which justice demands a new trial. For the reasons set forth above with respect to Lane's Rule 29 motion, the jury's verdicts as to Additional Findings #1 and #2 were not manifestly unjust. It is unremarkable that over the course of the eight years between Hoard's murder and Lane's trial, these and other witnesses would recount events differently in some respects, and neither such discrepancies nor the fact that they had attractive plea deals renders their testimony implicating Lane in the Hoard/Palmer shootings incredible as a matter of law. The defense had a full opportunity to present evidence and argument about the unreliability of Jones and Parker and the jury's mixed verdict with respect to those shootings— which found that Lane was a culpable participant but not necessarily the shooter—reflects careful consideration and weighing of the testimony they provided. In the court's view, the jury's Additional Findings as to Lane's involvement in the Hoard/Palmer shootings works no injustice.

### 24. Upholding the jury's verdicts as to the Thomas/Curtis attempt murders would not be manifestly unjust.

Similarly, Lane again challenges the jury's Additional Findings as to Lane's involvement in the attempted murders of Darrel Thomas and Jerome Curtis, ostensibly contending that those findings are manifestly unjust (though it does not use that term) because the shootings had nothing to do with the LAFA enterprise. He adds nothing to that argument that the court did not consider

in denying his motion to vacate those findings, however, and the court rejects the argument in the context of Lane's motion for a new trial as well.

\* \* \* \* \*

For the foregoing reasons, Defendant Lane's motions for acquittal as to the Additional Findings and for a new trial are denied.

Dated: August 28, 2024

John J. Tharp, Jr.
United States District Judge